IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| TRACY MORGAN, ARDLEY FUQUA, JR. JEFFREY MILLEA and KRISTA MILLEA<br><br>    Plaintiffs,<br>v.<br><br>WAL-MART STORES, INC and WAL-MART TRANSPORTATION, LLC<br><br><br><br>    Defendants. | COMPLAINT<br><br>Docket No.<br><br>PLAINTIFF DEMANDS A TRIAL BY JURY |

Plaintiffs Tracy Morgan, Ardley Fuqua, Jr., Jeffrey Millea, and Krista Millea by their attorneys, MORELLI ALTERS RATNER, LLP, respectfully allege as follows:

## NATURE OF THE CASE

1.  This is a civil action for personal injuries suffered by Plaintiffs Tracy Morgan, Ardley Fuqua, Jr. and Jeffrey Millea, and for loss of consortium by Krista Millea (collectively "Plaintiffs") against Defendants Wal-Mart Stores, Inc. and Wal-Mart Transportation, LLC (collectively "Wal-Mart"). This action arises out of a motor vehicle accident on June 7, 2014 on the New Jersey Turnpike, in which a Wal-Mart truck operated by Kevin Roper collided with the rear end of the vehicle in which Mr. Morgan, Mr. Fuqua, and Mr. Millea were passengers. The Defendants' negligence was a substantial contributing factor in causing Plaintiffs' injuries.

## PARTIES

2.  Plaintiff, Tracy Morgan is an individual and citizen of the state of New Jersey. Mr. Morgan is a comedian and actor.

3. Plaintiff Ardley Fuqua, Jr. is an individual and citizen of the state of New Jersey. Mr. Fuqua is a comedian.

4. Plaintiff Jeffrey Millea is an individual and citizen of the state of Connecticut. Mr. Millea is Mr. Morgan's personal assistant.

5. Plaintiff Krista Millea is an individual and citizen of the state of Connecticut, and is Plaintiff Jeffrey Millea's wife.

6. Defendant Wal-Mart Stores, Inc. is a Delaware Corporation whose principal place of business location is Bentonville, Arkansas. Wal-Mart Stores has stores and distribution centers throughout the United States and the world.

7. Defendant Wal-Mart Transportation LLC is a wholly-owned subsidiary of Wal-Mart Stores, Inc. Defendant Wal-Mart Stores, Inc. is a Delaware Corporation whose principal place of business location is Bentonville, Arkansas. Wal-Mart Stores has stores and distribution centers throughout the United States and the world.

## VENUE AND JURISDICTION

8. This Court has original jurisdiction over this action under 28 U.S.C. § 1332, in that the amount of controversy exceeds seventy five thousand dollars ($75,000) and Plaintiffs are citizens of states which are different from the states where Defendants are incorporated and have their principal places of business.

9. Venue is proper in this district, because the accident occurred in Cranbury, NJ, in the County of Middlesex, which falls within the jurisdiction of this Court. Further, the New Jersey State Police conducted an investigation at the scene of the accident, the driver of the Wal-Mart truck, Kevin Roper, was charged with crimes related to this accident in New Jersey, and any potential witnesses to the accident are likely to be located in New Jersey.

## FACTUAL ALLEGATIONS

10. Wal-Mart is the world's largest retailer, with nearly 11,000 stores worldwide. For the fiscal year ending on January 2014, Wal-Mart had sales of approximately $473 billion and ranks first on the *FORTUNE500* list of the world's largest companies by revenue.

11. Wal-Mart has its own private fleet of trucks which comprises one of the largest transportation operations around the globe. The fleet consists of approximately 7,400 drivers, 80,000 associates in logistics, 6,121 tractors, 60,000 trailers, and 124 distribution centers. Wal-Mart drivers drive over 713 million miles per year, making deliveries to over 4 million stores annually.

<u>Wal-Mart Truck Driver: Kevin Roper</u>

12. On June 7, 2014, Kevin Roper was employed by Wal-Mart as a truck driver.

13. Mr. Roper lived in Jonesboro, Georgia.

14. Mr. Roper's job was based out of a Wal-Mart facility in Smyrna, Delaware.

15. Upon information and belief, on the morning of June 6, 2014, Mr. Roper commuted from his home in Jonesboro, Georgia to the Wal-Mart facility in Smyrna, Delaware to commence his shift.

16. Mr. Roper began his shift at approximately 11:22 a.m. on June 6, 2014.

17. Mr. Roper's shift consisted of driving a 2011 white Peterbilt truck-tractor and semitrailer combination vehicle ("Truck") north, and making various pickups and deliveries at Wal-Mart facilities along the way.

<u>Tracy Morgan, Ardley Fuqua, Jr. and Jeffrey Millea</u>

18. On the evening of June 6, 2014 Mr. Morgan performed a stand-up comedy show at Dover Downs Hotel & Casino ("Dover Downs") in Delaware. This show was part of his national "Turn It Funny" comedy tour.

19. Mr. Fuqua was one of the opening acts on the "Turn It Funny" tour, and performed at the Dover Downs show on June 6, 2014.

20. After the show, Dover Downs provided transportation home for Mr. Morgan, Mr. Fuqua, Mr. Millea, and two other comedians traveling with Mr. Morgan as part of his tour: James McNair, and Harris Stanton.

21. Dover Downs hired Atlantic Transportation to transport Mr. Morgan, Mr. Fuqua, Mr. Millea, Mr. McNair, and Mr. Stanton (collectively, "the passengers") home after the show.

22. Atlantic Transportation provided a 2012 black Mercedes Sprinter ("limo") to transport the passengers home from Dover Downs.

23. The limo—driven by Tyrone Gale of Atlantic Transportation– left Dover Downs with the passengers headed north at approximately 11:30PM on June 6, 2014.

<u>The Accident</u>

24. At approximately 12:54AM on June 7, 2014, both the Limo and the Truck were traveling north on the New Jersey Turnpike near Cranbury, New Jersey.

25. As the truck approached milepost 71.4, traffic had slowed due to construction work ahead on the New Jersey Turnpike.

26. The speed limit was reduced from 55 miles-per-hour to 45 miles-per-hour near milepost 71.4 because of the construction work.

27. Signs were posted approximately .4 miles south of milepost 71.4 to warn of the speed limit reduction.

28. The right and center lanes of the New Jersey Turnpike were closed in the vicinity of the construction zone near milepost 71.4.

29. About .9 miles south of the crash location, an advance warning sign notified northbound traffic of the lane closure ahead.

30. At approximately 12:54AM on June 7, 2014, the Truck struck the rear of the Limo.

31. The truck was traveling 65miles-per-hour at the time of impact, and had been traveling this speed for the 60 seconds preceding the collision.

32. After the collision, the Limo and Truck moved forward and collided with other cars that were slowed in the traffic near the construction.

33. The limo rolled over and came to rest on its left side, facing east, across the center and right lanes.

34. Mr. Morgan, Mr. Fuqua, and Mr. Millea were extracted from the car, and transported to the hospital.

### (First Count)
### Negligence - (Tracy Morgan)

35. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

36. On or about June 7, 2014, Plaintiff Tracy Morgan was a passenger in a 2012 black Mercedes Benz Sprinter, with Delaware license plate number LX1964 ("Limo"), owned by Atlantic Transportation Services LLC.

37. On or about June 7, 2014, the Limo that Mr. Morgan was a passenger in was being operated by Tyrone Gale, an employee of Atlantic Transportation Services LLC, in the regular course of business.

38. On or about June 7, 2014, Kevin Roper was driving a 2011 white Peterbilt truck-tractor and semitrailer combination vehicle ("Truck"), with Oklahoma license plate number 2PX016, owned by Wal-Mart Transportation LLC.

39. Mr. Roper was an employee of Wal-Mart, and was operating his truck in the regular course of business.

40. On or about June 7, 2014, while Mr. Morgan was a lawful passenger in the Limo, Mr. Gale and Kevin Roper were involved in a motor vehicle collision on the New Jersey Turnpike by milepost 71.4 near Cranbury, New Jersey, when Mr. Roper's Truck collided with the rear of the Limo.

41. Walmart was careless and negligent in the ownership and operation of its motor vehicle, which caused Mr. Morgan to suffer severe personal injuries.

42. As a direct and proximate result of said collision, Mr. Morgan was caused to sustain severe painful bodily injuries, including but not limited to multiple fractures which required multiple surgeries, extensive medical treatment, and will require significant physical rehabilitation.

43. As a direct and proximate result of the physical injuries sustained by Mr. Morgan in the collision, he has been incapacitated from pursuing his usual employment and other activities, may be left with disabilities that will in the future similarly incapacitate him and cause him pain and suffering, and may require medical treatment.

## (Second Count)
## Negligence –(Ardley Fuqua, Jr.)

44.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

45.     On or about June 7, 2014, Plaintiff Ardley Fuqua, Jr. was a passenger in a 2012 black Mercedes Benz Sprinter, with Delaware license plate number LX1964 ("Limo"), owned by Atlantic Transportation Services LLC.

46.     On or about June 7, 2014, the Limo that Mr. Fuqua was a passenger in was being operated by Tyrone Gale, an employee of Atlantic Transportation Services LLC, in the regular course of business.

47.     On or about June 7, 2014, Kevin Roper was driving a 2011 white Peterbilt truck-tractor and semitrailer combination vehicle ("Truck"), with Oklahoma license plate number 2PX016, owned by Wal-Mart Transportation LLC.

48.     Mr. Roper was an employee of Wal-Mart, and was operating his truck in the regular course of business.

49.     On or about June 7, 2014, while Mr. Fuqua was a lawful passenger in the Limo, Mr. Gale and Kevin Roper were involved in a motor vehicle collision on the New Jersey Turnpike by milepost 71.4 near Cranbury, New Jersey, when Mr. Roper's Truck collided with the rear of the Limo.

50.     Walmart was careless and negligent in the ownership and operation of its motor vehicle, which caused Mr. Fuqua to suffer severe personal injuries.

51.     As a direct and proximate result of said collision, Mr. Fuqua was caused to sustain severe painful bodily injuries, including but not limited to multiple fractures which required

multiple surgeries, extensive medical treatment, and will require significant physical rehabilitation.

52. As a direct and proximate result of the physical injuries sustained by Mr. Fuqua in the collision, he has been incapacitated from pursuing his usual employment and other activities, may be left with disabilities that will in the future similarly incapacitate him and cause him pain and suffering, and may require medical treatment.

**(Third Count)**
**Negligence – (Jeffrey Millea)**

53. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

54. On or about June 7, 2014, Plaintiff Jeffrey Millea was a passenger in a 2012 black Mercedes Benz Sprinter, with Delaware license plate number LX1964 ("Limo"), owned by Atlantic Transportation Services LLC.

55. On or about June 7, 2014, the Limo that Mr. Millea was a passenger in was being operated by Tyrone Gale, an employee of Atlantic Transportation Services LLC, in the regular course of business.

56. On or about June 7, 2014, Kevin Roper was driving a 2011 white Peterbilt truck-tractor and semitrailer combination vehicle ("Truck"), with Oklahoma license plate number 2PX016, owned by Wal-Mart Transportation LLC.

57. Mr. Roper was an employee of Wal-Mart, and was operating his truck in the regular course of business.

58. On or about June 7, 2014, while Mr. Millea was a lawful passenger in the Limo, Mr. Gale and Kevin Roper were involved in a motor vehicle collision on the New Jersey

Turnpike by milepost 71.4 near Cranbury, New Jersey, when Mr. Roper's Truck collided with the rear of the Limo.

59. Wal-Mart was careless and negligent in the ownership and operation of its motor vehicle, which caused Mr. Millea to suffer severe personal injuries.

60. As a direct and proximate result of said collision, Mr. Millea was caused to sustain severe painful bodily injuries, including but not limited to multiple fractures which required multiple surgeries, extensive medical treatment, and will require significant physical rehabilitation.

61. As a direct and proximate result of the physical injuries sustained by Mr. Millea in the collision, he has been incapacitated from pursuing his usual employment and other activities, may be left with disabilities that will in the future similarly incapacitate him and cause him pain and suffering, and may require medical treatment.

**(Fourth Count)**
**Loss of Consortium – (Krista Millea)**

62. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

63. As a consequence of the car accident further described above, Mr. Millea sustained significant and permanent injuries as more fully described above.

64. Before suffering the injuries resulting from the accident, Mr. Millea was able to and did perform all the duties of a husband and did perform these duties, including but not limited to maintaining the home, providing love, companionship, affection, society, sexual relations, moral support, and solace to his wife, Krista Millea.

65. Ms. Millea was 8 months pregnant at the time of the accident.

66. Mrs. Millea suffered from loss of society and consortium as a result of the injuries to her husband.

## Wal-Mart's Reckless or Intentional Conduct

67. Wal-Mart knew, or should have known, that Mr. Roper's hours were not in compliance with Federal Motor Carrier Safety Administration ("F.M.S.C.A.")Regulations, which were enacted largely to combat the dangers of driver fatigue.

68. Wal-Mart knew, or should have known, that Mr. Roper was awake for more than 24 consecutive hours immediately before the subject accident on June 7, 2014.

69. Wal-Mart knew or should have known that it was unreasonable for Mr. Roper to commute more than 700 miles from his home in Jonesboro, Georgia to work at a Wal-Mart facility in Smyrna, Delaware, especially immediately before he was to commence a long shift operating a truck that weighed approximately 30–40 tons.  Additionally, there were many Wal-Mart distribution facilities closer to Mr. Roper's home — including at least nine in Georgia alone—which would have significantly reduced Mr. Roper's commute to work.

70. As a result of Mr. Roper's fatigue, he fell asleep behind the wheel of his truck while he was driving, failed to slow down for traffic ahead, and resultantly collided with the Limo directly in front of him in which Plaintiffs were passengers.

71. Further, the Truck being operated by Mr. Roper was state-of-the-art, and equipped with sophisticated collision-avoidance systems all designed to begin automatically braking the truck when it senses slowing down traffic.

72. However, the Truck did not automatically brake before the accident, and thus, Wal-Mart knew or should have known that one of the truck's most important safety features was compromised.

73. Had the truck's automatic brakes been properly functioning, the subject accident could have been avoided.

74. Defendant knew that its actions were substantially certain to result in serious injury or death because operating trucks, by its nature, is a dangerous activity, and Wal-Mart heightened this danger through its activities.

75. Upon information and belief, Wal-Mart recklessly and intentionally engaged in a pattern and practice of having its drivers violating the F.M.S.C.A. Regulations.

76. Upon information and belief, Wal-Mart knew or should have known that its drivers were routinely working shifts longer than permitted under the F.M.C.S.A. Regulations , driving more hours per day than permitted under the F.M.S.C.A. Regulations, driving more consecutive hours without rest than permitted under the limits set forth in the F.M.S.C.A. Regulations, and working more hours per week than permitted under the F.M.S.C.A. Regulations

77. Wal-Mart not only failed to condemn, but condoned this practice of its drivers routinely violating the F.M.S.C.A. Regulations.

78. Wal-Mart knew or should have known that its drivers were routinely fatigued— thus putting themselves and others on the road in danger— because in addition to working long shifts driving trucks, they regularly commuted hundreds of miles to get to work.

79. For example, Mr. Roper's commute to work was over 700 miles, which would have taken him over 11 hours if he drove 60 mph the entire way.  However, there were many other distribution centers closer to his home.

80. Wal-Mart has over 124 distribution facilities across the country, and could have made accommodations for many of its drivers to reduce their commutes to work, thereby

reducing the number of total hours they had to drive and thus reducing the likelihood that they would suffer from fatigue.

81. Even if Wal-Mart's drivers were marginally complying with the maximum-hour limits set forth under the F.M.S.C.A. Regulations, the time commuting to work was not factored into the F.M.S.C.A. Regulations.  Thus, between commuting to work and driving trucks for work, Wal-Mart had a custom and practice of recklessly and intentionally allowing its drivers to drive for prolonged and unreasonable periods of time, making them exceedingly vulnerable to suffer from fatigue.

82. Upon information and belief, Wal-Mart recklessly and intentionally failed to take proper measures to combat the serious danger of its drivers suffering from fatigue.

83. As a direct, substantial, and proximate result of the reckless or intentional conduct of Wal-Mart, as set forth above, Plaintiffs suffered serious injuries and damages.

84. Wal-Mart's acts and/or failures to act under the circumstances of this case were outrageous in that Wal-Mart's conduct amounted to reckless indifference to the safety of its drivers, and of other drivers and passengers on the road.

85. As a result of Wal-Mart's gross, reckless, willful, wanton, and intentional conduct, it should be appropriately punished with the imposition of punitive damages.

## DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a jury trial as to all issues so triable as a matter of right, pursuant to F.R.C.P. 38(b)(1) and 38(c).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand upon Defendants:

    a.     actual, compensatory and statutory damages;

b. punitive damages as allowed by law;

c. pre and post-judgment interest as allowed by law;

d. injunctive relief;

e. an award of attorneys' fees as allowed by law;

f. an award of taxable costs; and

g. any and all such further relief as this Court deems just and proper.

**MORELLI ALTERS RATNER, LLP**

By: __/s/ David T. Sirotkin
David T. Sirotkin
D.N.J. Bar ID: DS4863
dsirotkin@morellialters.com

Benedict P. Morelli
N.Y. Bar No.: 1060441
bmorelli@morellialters.com

David S. Ratner
N.Y. Bar No.: 1011279
dratner@morellialters.com

777 Third Avenue, 11th Floor
New York, New York 10022
Tel: (212) 751-9800
Fax: (212) 751-0046

Attorneys for Plaintiffs

Date: July 10, 2014